272617
21390 Old State Road 37
Branchville, IN 47514

SCANNED at BCF and Emailed on
8/25/2020 by PM - 37 pages.
(date)   (initials)   (num)

FILED
4:22 pm, Aug 25, 2020
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

Civil Action No. 3:20-cv-00201-RLY-MPB

Anthony Bennett, individually and on behalf of all adult prisoners who are or will be housed in the Restrictive Housing Unit at Branchville Correctional Facility — Plaintiffs

V.

Kathy Alvey; Shannon Sturgeon — Defendants

## CLASS ACTION CIVIL RIGHTS COMPLAINT

### A. PARTIES

1. I, Anthony Bennett am a citizen of Indiana and presently reside at Branchville Correctional Facility

2. Defendant Shannon Sturgeon is a citizen of Indiana whose address is 21390 Old State Road 37 Branchville, IN 47514 and is employed as Major at Branchville Correctional Facility

Defendant Kathy Alvey is a citizen of Indiana whose address is 21390 Old State Road 37 Branchville, IN 47514 and is employed as Warden of Branchville Correctional Facility

### B. JURISDICTION

This cause of action is brought pursuant to 42 USC § 1983

### C. NATURE OF THE CASE

The Proposed Class — who are inmates housed in the Restrictive Housing Unit at Branchville Correctional Facility Branchville Indiana — challenge various policies enacted by Kathy Alvey and Shannon Sturgeon in their official capacities. Plaintiffs allege that (1) housing inmates in the recreation cell is in violation of their Eighth Amendment right and (2) that prohibiting the use of the tablet which has access to worship services and legal resources is violative of the

1

Fourteenth Amendment and 42 USC §2000

## D. CAUSE OF ACTION

Plaintiffs allege that the following of their Constitutional rights, Privileges or immunities have been violated and that the following facts form the basis of the allegations:

Claim I: The Policy enforced by Defendants Kathy Alvey (the Warden) and Shannon Sturgeon (the Major) regarding housing inmates in the recreation cell with no toilet, no running water, forcing them to sleep on the floor with the light constantly illuminated constitutes a violation of the Eighth Amendment. Also, because of their knowledge of these conditions based on regular visits to the unit and documented layout of the Restrictive Housing Unit in conjunction with letters and grievances and incident reports regarding the conditions, Defendants are deliberately indifferent to the aforementioned conditions.

Facts: The Restrictive Housing Unit (RHU) is a housing unit designated for segregating inmates classified as Administrative Segregation, Investigative Status, Disciplinary Segregation or Protective Custody. The unit is divided into 2 tiers ("ranges") with each range consisting of 15 cells, 2 showers and 1 recreation cell ("rec cell"). There is also 1 Observation cell located in the foyer, which is occasionally used for close watch. The purpose of the rec cell is for what the name implies, recreation, its only furnishings being a pull up bar and a small access door for the plumbing. The light in the cell is never turned off or dimmed.

The rec cell is also used to hold inmates who have committed a rule infraction and are either kept for a few hours and sent back to their housing unit or are waiting for cell placement. Inmates brought here either punch walls leaving behind blood or masturbate leaving behind semen. Since there is no toilet nor inmate bathroom in the foyer, inmates in the rec cell are given a urinal and a bed pan. No opportunity for hand washing is afforded.

When there are no available cells and custody staff decides to

2

Confine an inmate in RHU is assigned to the rec cell. If they have relieved themselves the inmate must either keep the bed pan and/or urinal in the cell with him or pass it through the same slot used to distribute food. This is dependent on the officer. Either way no biohazard clean up is conducted for biohazard waste.

After a day or so, a rotation occurs if there are no cells available. The process involves the custody staff designating an inmate on protective custody ("a check-in") to swap the inmate in the rec cell. The officer will notify the check-in to pack his property and if he refuses is issued a conduct report which contributes to his security level points and can ultimately increase his custody level. The officer then moves on to the next check-in. If the has exhausted all inmates on protective custody, the next step is to summon the tactical team to forcefully remove a check-in of their choosing. Cell extraction consists of several direct orders to cuff up up before pepper spray is used until the inmate acts accordingly. Each cell extraction is video recorded.

On June 21, 2020 I received a conduct report for refusing to be housed in the rec cell [EXHIBIT 1(a)] I notified, at the time of the incident, the active sergeant for RHU that I was prescribed a diuretic that is to be taken daily for treatment of my medical condition and needed constant access to the bathroom once the medication takes effect. Sgt Easton said that because I was on protective custody status, per policy I had to be assigned to the rec cell and if I refused he was issuing me a conduct report. There were approximately 20 inmates who were on protective custody status. All refused. Inmate Roberts—who was on protective custody and assigned to Range 1—was subsequently cell extracted and placed into the rec cell. This was the second time in approximately 30 days that he was forcefully removed from his cell and placed into the rec cell, despite offenders on other statuses besides protective custody being housed in the unit.

I spoke with many RHU officers over the past few months regarding the use of the rec cell to house inmates. All the officers said they were following orders and had no authority over the matter. Some officers were more specific about the enforcement of the policy. Officer Rau and Officer Bockting—both of whom are regularly scheduled to work the day shift in RHU—informed

3

for housing inmates when RHU has no vacancies. They further indicated the Major declared that only check-ins were to be used for cell rotation despite the insignificant number of check-ins housed in RHU. Officer Hefke said the rationale for this stems from the belief that check-ins are less likely to be confrontational and thus offer the least resistance when told to move into the rec cell.

There have been a number of inmates who have been recently assigned to the rec cell including Derrick Welch – who is located in cell 109 and currently on protective custody – Adam Blanken – who has provided an affidavit (EXHIBIT 9) – and David Flax. Mr. Flax was assigned to the rec cell from June 12, 2020 to June 15, 2020 and was cell extracted for refusing to clean up his feces after being denied the bathroom. He was immediately transferred.[1]

EXHIBIT 1(b) is the exhausted grievance, which shows the acknowledgment from the administration of the use of the rec cell for housing. RHU surveillance footage also corroborate the statements of this claim.

Argument: In Thomas v. Brown, the District Court for the Northern District of Indiana stated that "the lack of running water in a cell in and of itself may constitute sufficiently serious deprivation of the Eighth Amendment" [824 F. Supp 160, 163-164]. This sentiment is echoed by the District Court of Massachusetts' ruling in Strachan v. Ashe [548 F. Supp 1193 (1983)]. Judge Freedman held that prison authorities violated Mr. Strachan's rights by confining him into an isolation cell that was generally not used for inmate housing, with no toilet, no running water and giving him a bucket to hold his bodily wastes. In the instant case, plaintiffs are subjected to inhumanely reside in a cell similar to that in Strachan. Inmates cannot sanitarily dispose of their human wastes having to squat over a bed pan or urinate in a plastic bottle. When these containers are issued through the food slot, bodily wastes are sometimes diffused. I have been in the rec cell a few times and have noticed massive amounts of dried semen, urine, blood and what appeared to be feces on the walls. Although cleaning supplies are distributed daily, upon request, no special cleaning is performed for the biohazard waste. Per policy, inmates are not permitted to clean bodily excrements.

Inmates – especially check-ins – who have already been punished by the courts, must endure additional privations

4

in accordance to the prohibition of the Eighth Amendment's Cruel and unusual Punishment [White V. Nix F.3d 120, 121 (8th Cir 1993)] Because "Prisoners do not Surrender these rights to equal Protection at the Gate" [Williams V. Lane 851 F.2d 867 (7th Cir) cert. denied 488 U.S. 1047, 102 L.Ed.2d 1001, 109 S.Ct 879 (1994)] these conditions are contrary to such prohibitions due to the deprivation of "adequate Sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination which are basic needs of a prisoner protected by the Eighth Amendment" [Whitnack V. Douglas 16 F.3d 954, 958 (8th Cir 1995)]

    The Administration has argued that the rotation only lasts for 24 hours. However Courts have recognized constitutional violations even for shorter periods of time due to the deprivation of an <u>identifiable human need</u> immediately upon being subjected to the inhumane condition. [Gordon V. Faber 973 F.2d 686, 687-688 (8th Cir 1992)]. As previously stated in Whitnack V. Douglas, supra, a basic human need is adequate Sanitation and the ability to safely dispose of one's wastes. "The unavailability of cells normally used for isolation of inmates cannot justify subjecting Plaintiffs to the unconstitutional conditions of the Rec Cell." [Strachan V. Ashe 548 F. Supp 1193, 1203 (D. Mass 1982)]

    Defendants were aware of the lack of inmate bathrooms in RHU. Defendants were also aware of the lack of toilets and running water in the rec cell based on Visits to the unit. Yet Defendants have maliciously insisted on the continued use of the rec cell despite letters and grievances filed pertaining to this matter. This axiom has caused me to become solicitous when cells become full because at any moment I can be swapped, and I developed an utter loathing for the Administration for their acquiescence to this policy." The deprivation of elementary sanitary facilities automatically and without having disobeyed any of the institutional rules is not only hazardous to health but [causes] an institutional disdain for inmates which is bound to have a cumulative effect and to produce in them feelings of depression and despair" [Bel V. Hall 329 F. Supp 274, 277 (D. Mass 1975)] further revealing how draconic the policy is.

    Additionally, if it is vitally urgent for custody staff to use the rec cell to house inmates, then classification status should be of

5

of no concern for their placement. Yet the arbitrariness of the policy is displayed by the stigma, according to officer's statement that check-ins are non-confrontational and therefore won't pose a problem when told to move. This stereotype is akin to saying that all overweight people have a body odor or that all Arabs are terrorists. This absurd belief is highly credible supported by the evidence of recent developments. Currently there are a total of 11 check-ins in RHU, out of 30 inmates (not including the observation cell). Of the 11 check-ins approximately 6 have medical or mental health issues that prevents their placement in the rec cell. The remaining 5 can be rotated, which is exactly what staff enforces. These 5 inmates (which Mr. Derrick Welch is one of) are rotated multiple times despite about 20 other people being possible rotation candidates. This theory exposes the predatory nature of the Defendants. It is no different than the bully roaming the school halls picking on the weakest kid in the group.

Furthermore, it is impermissable for staff to divulge an inmates status to another offender. Yet the policy implemented negates this for everyone in RHU knows that only inmates on protective custody are swapped in the rec cell. So if an offender wishes to falsify his reason for being in RHU, or simply remain silent because he is on protective custody, that option is no longer viable if he is placed in the rec cell.

Justice Roberts, in his opinion in Wolf v. McDonnell stated "The goal [of prisons] is to reintegrate inmates into a society where men are supposed to be treated fairly by government not arbitrarily. The...procedure is counterproductive" [post 418 U.S. 539, 597, 94 S.Ct 2963, 41 L.Ed 2d 935 (1974)] and therefore this policy should be struck down.

Claim II: Defendant Alvey's prohibition of tablets for protective custody inmates (1) precludes access to worship and faith based resources, which is in violation of 42 U.S.C §2000 Religious Land Use of Institutionalized Persons and (2) is preclusive to legal aid resources that are currently unavailable in the institution which hinders access to courts, a violation of the Fourteenth Amendment.

Facts: On April 24, 2020 I was brought to RHU for assaulting an inmate with a weapon. All property, including my

6

tablet were issued. Several days later, I was to be released from RHU. However I told Officers that I desired Protective Custody. I signed the necessary documentation and was reclassified. Later that evening, while showering, RHU Officers conducted a routine shakedown of my cell. They confiscated my tablet without appraisal. When I asked for my tablet they said I wasn't allowed to have it because of my Protective Custody status. EXHIBIT 2 shows the grievance I filed stemming from this incident.

Since Lieutenant Simpson is the RHU Superintendent, I told him about the confiscation and needed to access religious and worship services on the tablet. Services there are currently unavailable at the institution. I also told him that there are legal resources available on the tablet that are not provided in RHU, and that these resources are greatly needed since I am working on Post-Conviction relief. He said that he did not implement the tablet policy since it was already enforced prior to him taking charge of the unit. He did, however prohibit the ordering of food from commissary for check-ins (which is also the same policy enforced for disciplinary seg.) He said this was to curb those who wanted to "vacation" in RHU and said "there's a possibility" this is the reason for the tablet restriction among check-ins although he was not certain. This however was confirmed by Officer Rau and Bockting who said that the policy was ordered to keep people from "running to check-in"

Chaplain Arndt, who is employed as Chaplain at Branchville stated that the Department of Corrections in a joint effort with GTL—the service provider for the tablets—provided worship services virtually for various faiths to compensate for the lockdown of many facilities statewide due to the pandemic. The chaplain said there is a possibility these services will become permanent even after the pandemic contingent on the agreement with the various organizations providing these services. The other resources will remain on the tablet.

GTL has also provided the Lexis application for use on

7

services such as shepardizing and access to various legal publications. Many of the services offered on the app are not available from the law library. I have requested some basic services such as shepardizing (EXHIBIT 6), and obtaining publications like the Indiana Code Annotated (EXHIBIT 4) and Federal Rules of Civil Procedure (EXHIBIT 8) all which are unavailable. I have requested current case law (EXHIBIT 7) but the library does not have access to recent cases. In order to gain the information that I cannot get from the law library, I have to ask other inmates to get the material from their tablet. They would then "Cadillac" (pass a line from cell to cell) the pertinent information to me. One inmate allowed me to use his tablet for about an hour to conduct necessary research. Performing these acts are a major rule violation.

These methods are necessary since there are no inmate law clerks assigned to RHU (even before the Covid-19 outbreak) and gaining assistance from the law library is not efficient. Once a week, the civilian paralegal visits the RHU, picking up request slips which are delivered to the law clerks to answer. The paralegal also distributes requested legal materials and supplies. When asked legal related questions, the paralegal often responds by saying send a request. Relying heavily on the inmate law clerks for answers. Offenders have to be specific in questions they ask which may not be within the ability of most inmates.

RHU does have an extremely limited amount of legal books that inmates can request from the officer and keep in his cell. The titles include the Indiana Legal Directory, Indiana Rules of Court, Indiana Civil Law and Procedure, Indiana Criminal Code and Prisoner's Self Help Litigation Manual (although half of the publication is missing while other pages are torn. The book is over 12 years old.) There are no listings of books available for the RHU and most inmates and some officers do not know where the books are stored nor are aware that RHU even has legal books.

Even worse, there are fewer publications for loan from the law library since many titles are in computer format. The only printed publication available for loan is the Jailhouse Lawyers Manual and Handbook. The Manual is broken into chapters of 10 so an offender would have to request a Table of Contents

8

The publications, the ones vital for research which are in digital format are Federal Rules of Civil Procedure, Indiana Code Annotated and the United States Code Annotated. Digests, Reporters, encyclopedias and dictionaries are not available for loan in RHU.

EXHIBIT 5 shows the librarian's response that only 1 case could be found regarding a lack of toilets in prison cells despite the vast amount of cases on the topic.

Argument I: Since staff segregates inmates who pose a threat to security, offenders are precluded from physically participating in institutional programs such as education and religious services. Prior to the establishment of tablets inmates had no options to their preferred method of worship, segregated inmates were limited to literature available and not all faiths were supplied. Some offenders in RHU could not obtain spiritual guidance from clergy of their choosing (rabbi, imam, etc) because of limited access to chapel services. At the time, this was the least restrictive means of achieving security goals of the regulation. [Turner V. Safley 482 US 78 96 LEd 2d 64 107 S.Ct 2254] However, offenders in RHU — with the exception of check-ins and investigative status — are afforded their preferred method of worship with the religious resources and services available on the tablet.

The 7th Circuit Court stated in Koger V. Bryan that "Showing a denial of worship or attendance and not offering any other options to their preferred method of worship is a better choice of defeating of government of least restrictive means of furthering compelling interests" [523 F.3d 784 (7th Cir 2008)]. Offenders on protective custody — who seek protection — and investigative status — who haven't been declared of official wrongdoing — are still unable to pledge allegiance and devotion to their faith due to the prohibition of attendance of virtual worship services, which the tablet provides, a violation of 42 USC§ 2000.

Argument II: Litigation requires some level of skill. For this reason it is imperative that one has the necessary tools in order to effectively present a claim. "Legal research often requires browsing through materials in search of inspiration. Tentative theories may have to be abandoned in the face of unfamiliar adverse precedent... Certainly a prisoner unversed in the law.... will need more time or legal

9

assistance doing that is reduced to paper." [Walters v. Thompson 615 F. Supp 330, 339 (N.D Ill 1985) quoting Williams v. Leek 584 F. Supp 136, 139 (4th Cir 1979)]

Research is paramount to laying the foundation for a claim and setting forth the facts in a case. Although the facts are only needed to file for Post Conviction relief or a 1983 complaint, an adequate library or other legal assistance is essential for drafting these documents [Bounds v. Smith 430 U.S. 817 825-826 L.Ed 2d 97 S.Ct 1491]. These Petitions generally are granted if a case raises valid or factual and persuasive claims. Therefore access to the courts is "getting the courthouse door open in such a way that it will not automatically be slammed shut" [Knop v. Johnson 977 F.2d 966 1006-1007 (6th Cir 1992) cert denied sub nom Knop v. McGinnis 113 S.Ct 1415 122 L.Ed 2d 786 (1993)]

The runner system currently implemented in conjunction with an insignificant number of books available makes conducting meaningful research virtually impossible. EXHIBITS 3-8 show that the library does not have the fundamental tools for a person in RHU to guide them to developing a petition or complaint that won't be "deemed as frivolous or without merit even before granting in forma pauperis" [Bounds v. Smith 430 U.S. 817, 836 52 L.Ed 2d 72 97 S.Ct 1491] This is the reason that the court in DeMallory v. Cullen stated that "the runner system alone is not constitutionally adequate" [DeMallory v. Cullen 855 F.2d 422, 447 (7th Cir 1988)]

The Lexis app compensates for some, though not all, of the inadequacies found in accessing the law library. It is a temporary remedy until a fully functional library is produced. However to deny even the slightest opportunity to meaningful research prohibits access to the courts. The total denial of tablets for check-ins to stave off inmates requesting protective custody while allowing those who commit heinous behavioral violations to have a tablet creates an arbitrary policy. Some inmates have assaulted officers or inmates or have trafficked drugs into the facility yet have received a tablet. This course of action is analogous to the policy the Supreme Court invalidated in Procunier v. Martinez [416 U.S. 396, 419-422 40 L.Ed 2d 224 94 S.Ct 1800] There the prison barred law students and paraprofessionals employed by lawyers representing inmates yet allowed law students representing law schools to visit inmates unsupervised. The court deemed this ridiculous scheme arbitrary

10

The act of depriving inmates from requesting Protective Custody is not found in restricting tablets but by battling the drug epidemic that has plagued the facility for a substantial amount of time. Most offenders who have requested Protective Custody owe money from getting drugs on credit and are not able to settle their debt. Therefore, they are willing to undergo extensive questioning to determine the validity of their request for Protection. Recently the facility has incorporated the procedure of copying all correspondence — with the exception of legal mail — to eliminate smuggling of drugs into the facility since this was the vessel used to transport illegal substances. Since then, these substances are practically non-existent and therefore fewer people have requested Protective Custody. Consequently the number of check-ins are nearly in the single digits compared to several months ago despite the tablet restriction and cell rotation. [EXHIBIT 1(b)] This is evident through the current RHU population figures and the total number of disciplinary reports written regarding drug related offenses prior to the incorporation to now. There is no longer an influx of check-ins.

In addition, the classification committee thoroughly reviews all requests for Protective Custody prior to granting the offender Protection. All cases deemed implausible are denied. Therefore, any additional methods employed to deter the requests for Protection are considered Punishment [Black's Law Dictionary]

The Executive Order and the Administrative Policy — both enacted by the Commissioner of the Department of Corrections — does not state — either explicitly nor implicitly — that Protective Custody inmates and investigation Status inmates are to be prohibited tablets. The Warden is given the authority to restrict tablet usage on a <u>case-by-case</u> basis or facility-wide [Administrative Policy 02-01-109(10)(b)]. Therefore the warden is liable for the violations of the Plaintiffs' rights stated in this claim.

---

FOOTNOTE

1. Since the David Flax appeal no other statuses besides Protective Custody are initially housed in the rec cell unless during special circumstances. If no segregation releases can be made, the newly admitted inmate to RHU will not be placed in the rec cell but will be assigned to the cell of a check-in.

11

E. PREVIOUSLY DISMISSED ACTIONS AND ADMINISTRATING RELIEF

1. Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment?

   No

2. I previously have sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part D.

   Yes

   I have addressed these concerns in the form of a grievance according to the prisons grievance procedures. The grievances were denied.

3. I have exhausted available administrative remedies.

   Yes

   All levels of the grievance process were reached: Level I Formal Grievance and Level II Formal Appeal.

## F. PREVIOUSLY DISMISSED ACTIONS OR APPEALS

I do not have any civil actions or appeals brought in any court of the United States while being incarcerated or detained in any facility that was dismissed as frivolous, malicious or failure to state a claim upon which relief may be granted.

## G. RELIEF REQUESTED

The Plaintiffs pray the court grants the following relief:

1. Prohibitory injunction on the use of the recreation cell for housing
2. Declaratory judgment on worship attendance [when available and satisfies safety measures (i.e. virtual services)]
3. Injunction compelling Defendant Alvey to propose a course of action that will ameliorate Plaintiffs access to courts for the courts approval
4. Any additional relief the court deems appropriate

12